UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| BRENDA R. BURTON, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| vs. | ) | Case number 4:14cv0552 TCM |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This action under 42 U.S.C. § 405(g) for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner), denying the application of Brenda Burton (Plaintiff) for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, is before the undersigned by written consent of the parties. See 28 U.S.C § 636(c).

### Procedural History

Plaintiff applied for DIB in December 2011, alleging she was disabled as of May 1, 1991, because of arthritis, anxiety, panic attacks, high blood pressure, and her weight. (R.[1] at 75-81, 119.) Her application was denied initially and after a June 2013 hearing before Administrative Law Judge (ALJ) Jhane Pappenfus. (Id. at 7-14, 23-36, 42-47.) The Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 1-5.)

---

[1] References to "R." are to the administrative record filed by the Commissioner with her answer.

**Testimony Before the ALJ**

Plaintiff, appearing pro se,[2] was the only witness to testify at the brief administrative hearing.

Plaintiff has a twelve-grade education and has received training in filling out applications for people applying for loans. (Id. at 26-27.) At one time, she tried selling Avon products. (Id. at 27.) She has also worked on an assembly line and as a county clerk. (Id. at 27-28.)

Asked by the ALJ to describe her disabling impairments between 2004 and 2005,[3] Plaintiff replied she often had pain so great that it was difficult to walk. (Id. at 30.) Her doctor at the time told her she was pulling her leg muscles. (Id.) She has since learned she had developed arthritis by then. (Id. at 31.) Her doctor also told her to take two Aleve and two Tylenol at the same time and then to take Tylenol every two hours and Aleve as needed. (Id.) Also to relieve the pain, she used heating pads and creams. (Id.) Her doctor was a gynecologist who told her he could treat her problems. (Id.)

After the ALJ noted the paucity of medical records for the relevant period, inquired whether there were other relevant records available, and stated that Plaintiff would be given an opportunity to submit such, Plaintiff explained that she had been unaware that the doctor was not keeping better records and that the records should have included her treatment for

---

[2]Plaintiff signed a Waiver of Right to Representation, affirming, among other things, that she understood she had a right to be represented at the hearing and wished to proceed pro se regardless.

[3]Plaintiff last had earnings sufficient to be considered substantial gainful activity on May 10, 2004, and her date last insured was June 30, 2005. (See id. at 112.)

high blood pressure and her doctor's suggestion she take hormone shots for her nerves. (Id. at 33.)

Further noting that there was no diagnosed impairment for the relevant time period, the ALJ stated that there was no need to proceed further in the sequential evaluation process. (Id. at 34.)

Given the opportunity to add to her testimony, Plaintiff explained that she has always had trouble with her legs and with blood pressure. (Id.)

**Medical and Other Records Before the ALJ**

The documentary record before the ALJ included forms completed as part of the application process, documents generated pursuant to Plaintiff's application, and records from health care providers.

When applying for DIB, Plaintiff completed a Disability Report, disclosing that she stopped working on May 10, 2004. (Id. at 119.) Because of her condition, she had been allowed to work from home, but was then laid off when her employer reduced its staff. (Id.) She is 5 feet 5 inches tall and weighs 304 pounds. (Id.) Her medications include alprazolam for anxiety; amlodipine, Benicar, clonidine, and triamterene for high blood pressure; cyclobenzaprine, a muscle relaxer; diclofenac and hydrocodone for arthritis; and gabapentin for foot pain. (Id. at 122.) All are prescribed by Gretchen Kleusner, M.D., who she began seeing in approximately 2008. (Id. at 122-23.)

Plaintiff's earnings report lists annual earnings for the years from 1966 to 1997, inclusive, and from 2001 to 2004, inclusive. (Id. at 87.)

In April 2002, Plaintiff wrote the Office of Disability Adjudication and Review, explaining that Dr. Wilbois' records were incomplete. (Id. at 162.) For instance, they failed to include all her appointments, tests, prescriptions, and complaints and all his instructions to her. (Id. at 162.) On a Disability Report – Appeal form, Plaintiff disclosed that she has arthritis in her right shoulder and "[m]any blood clots" in her right leg from mid-thigh to the ankle. (Id. at 155.) These conditions began between 2011 and February 2012. (Id.)

The relevant medical records before the ALJ are summarized below in chronological order for the period before June 30, 2005.[4] Records generated after that date are summarized only insofar as they relate to Plaintiff's impairments before June 30, 2005.

Plaintiff first saw Ronald Wilbois, M.D., in 1974. (Id. at 219.) She then weighed 186 pounds. (Id.) She had had the usual childhood diseases, but no serious illnesses. (Id.) Her visits until 1977 were for gynecological or obstetrical concerns. (Id.) In 1977, she was treated for high blood pressure, and had an "[e]xcellent response" to a medication. (Id.) There are no notes from 1978. In 1979, Plaintiff was on medications to reduce her blood pressure. (Id. at 218.) There are no notes from 1980. She next saw Dr. Wilbois in June 1981 and again the next month. (Id.) Her blood pressure and weight were up. (Id.) She

---

[4]Plaintiff needed to be found disabled by June 30, 2005, to meet the insured status requirements for DIB. (Id. at 115.) "'When an individual is no longer insured for Title II disability purposes, [the Court] will only consider [her] medical condition as of the date she was last insured.'" **Davidson v. Astrue**, 501 F.3d 987, 989 (8th Cir. 2007) (quoting Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997)) (second alteration in original).

was restarted on medications. (Id.) Plaintiff returned to Dr. Wilbois in March 1982 for gynecological concerns. (Id.)

The next notation is from September 1998, when Plaintiff was "crying hysterically" and made an appointment with Dr. Wilbois. (Id. at 217.) He saw her the next month. (Id.) Her blood pressure was down, but she was described as "hormonal [and] hysterical." (Id.) She was prescribed Xanax (the brand form of alprazolam). (Id.) There are no more visits in 1998. (Id.) Plaintiff was seen regularly in 1999, 2000, 2001, 2002, 2003, and 2004 to receive injections of Depo-Estradiol, a female hormone. (Id. at 205-16.) In Spring 2004, Dr. Wilbois prescribed Dyazide (hydrochlorothiazide and triamterene) for Plaintiff's blood pressure. (Id. at 206.) In September, he began prescribing her Provera, a female hormone, in addition to the Dyazide. (Id. at 205.) His notes for 2005, 2006, 2007, 2008, 2009, and 2010 refer only to her medications and occasionally record her weight, blood pressure, and urinalysis results. (Id. at 201-05.) Dr. Wilbois' records also include the results of a March 2009 negative pap smear and a May 2010 benign mammogram . (Id. at 199-200.)

The earliest record before the ALJ of Plaintiff's visits to Dr. Kleusner is from January 2011. (Id. at 251-52.) She sought treatment for a pressure ulcer on her right hip. (Id. at 251.) Included in her past medical history are references to mild to moderate arthritis in her right knee and mild arthritis in her sacroiliac joints. (Id.) Plaintiff saw Dr. Kleusner twice in February for her pressure ulcer. (Id. at 223-25, 276-77.) At the second visit, she also consulted her about her essential benign hypertension and acute sinusitis. (Id. at 223.)

Plaintiff returned the next month with complaints of left ear pain. (Id. at 260-62.) Her past medical history was the same. (Id. at 260.)

Plaintiff next saw Dr. Kleusner in May for her hypertension, obesity, and acute fatigue/malaise. (Id. at 229-31.)

Five months later, on October 3, Plaintiff returned with complaints of acute sinusitis and peripheral neuropathy. (Id. at 241-43.) Her past medical history was the same. (Id. at 241.) Three weeks later, her complaints were of hypertension and obesity. (Id. at 263-65.)

Plaintiff had a renal ultrasound on November 3; it was normal. (Id. at 281-82.) When seeing her on November 8, Dr. Kleusner diagnosed her with renal failure and hypertension; restarted her on Benicar; and told to her increase her water intake and to watch the sodium levels in her diet and the amount of tea she drank. (Id. at 269-70.) On November 21, Plaintiff was seen by Dr. Kleusner for hypertension, unspecified renal failure, and acute osteoarthritis in multiple sites, for which she to continue taking diclofenac and was to take Vicodin as needed for breakthrough pain. (Id. at 287-89.) On December 6, Plaintiff was again seen by Dr. Kleusner for renal failure. (Id. at 298-300.) She reportedly was feeling well. (Id. at 298.) She was to restart taking angiotensin II receptor blockers (ARB) and a non-steroidal anti-inflammatory drug and was to drink fluids. (Id.) No past medical history was included. (Id.) Her only chronic problems were obesity and hypertension. (Id.) At her next, December 21, visit, Plaintiff's renal failure was described as being under "fair control." (Id. at 293-95.) She was also seen for hypertension and an acute backache, for which she was prescribed Cymbalta, an antidepressant also used to treat back pain. (Id. at 293.) As

before, her past medical history included the references to arthritis and her only chronic problems were obesity and hypertension. (Id.)

Plaintiff saw Dr. Kleusner on January 5, 2012, for pain in her right shoulder joint. (Id. at 255-57.) X-rays revealed no acute fracture or subluxation, but there was mild to moderate acromioclavicular and minimal glenohumeral osteoarthritis. (Id. at 283-84.) She returned on January 20 for a check of her hypertension and for back pain. (Id. at 244-46.) On examination, her extremities appeared normal. (Id. at 245.)

In February, Plaintiff consulted Dr. Kleusner about sudden edema (swelling) and pain in her right calf. (Id. at 278-80.) An ultrasound revealed moderate thrombus burden deep venous thrombosis (DVT) in her right leg. (Id. at 285-86.) The day after the ultrasound, Plaintiff was seen by Dr. Kleusner for her DVT. (Id. at 226-28.) Her past medical history included, as before, references to mild to moderate arthritis in her right knee and mild arthritis in her sacroiliac joints. (Id. at 226.) It also included a reference to mild to moderate acromioclavicular and minimal glenohumeral osteoarthritis in her right shoulder. (Id.)

In March, Plaintiff was treated for sciatica, DVT, and benign hypertension. (Id. at 308-09.) DVT was added to hypertension and obesity on the list of chronic problems. (Id. at 308.)

Four months later, on July 30, Plaintiff was seen by Dr. Kleusner for hypertension and DVT; the treatment notes list the same chronic problems and same past medical history as before. (Id. at 310-12.) After she was seen, Plaintiff underwent an ultrasound, which

revealed no evidence of DVT and an interval resolution of previous thrombus within both lower extremities. (Id. at 320.)

In November, Dr. Kleusner treated Plaintiff for chronic renal failure and sinusitis. (Id. at 385-87.)

On December 4, she saw Plaintiff for hypertension, a hypercoagulable state (a blood clotting disorder), and osteoarthritis. (Id. at 382-84.) All were described as being under "[f]air [c]ontrol." (Id. at 382.) Plaintiff wanted an injection in her shoulder for the arthritis; however, Dr. Kleusner wanted to stop the coumadin Plaintiff was taking to prevent blood clotting for a few days before giving her the injection. (Id.) Plaintiff was described as being on "chronic [V]icodin." (Id.) Three days later, Plaintiff was seen for a strep throat. (Id. at 377-79.) Her chronic problems included obesity, hypertension, hypercoagulable state, and DVT. (Id.)

Plaintiff saw Dr. Kleusner in January 2013 for pain in her right foot and ankle after a chair fell on it three weeks earlier and for an upper respiratory infection. (Id. at 374-76.) She was to continue taking Vicodin for pain and was prescribed an antibiotic for the infection. (Id. at 374.) Her chronic problems were the same. (Id.)

In March, Plaintiff was seen at Mercy Medical Center; the reported reason was a "medication problem." (Id. at 365-73.) It was also reported that she has lived with pain caused by osteoarthritis since the early 1980s. (Id. at 367.) The provider discussed with Plaintiff that it was likely that the osteoarthritis had started then and has since progressed.

(Id.) Because of the pain, Plaintiff was taking six Vicodin a day. (Id. at 367.) She was trying to get disability. (Id.)

The following month, Plaintiff had a well woman examination at Mercy Medical Center. (Id. at 343-65.) She had no clubbing, cyanosis, or edema in her extremities. (Id. at 346.)

Also before the ALJ were letters written by Dr. Kleusner on Plaintiff's behalf, each addressed to "To Whom It May Concern."

The earliest of these is a November 2009 letter. (Id. at 303.) Dr. Kluesner wrote that "[Plaintiff] is under my care and has the diagnosis of osteoarthritis that in addition to her weight is debilitating at both the knees and hips." (Id.) She invited the recipient to call if there were any questions. (Id.)

In March 2012, Dr. Kluesner, wrote that Plaintiff was, in her opinion, permanently disabled (Id. at 222.) Plaintiff had osteoarthritis in her back, hips, knees, and shoulders that prevented her from standing or sitting for longer than one hour. (Id.) Also, she recently developed DVT and was on blood thinners, limiting her abilities to stand or sit for long. (Id.) Her morbid obesity decreased "her endurance and ability work [sic] effectively." (Id.) Her hypertension was well controlled on medications. (Id.)

In May 2013, Dr. Kluesner wrote that she has been treating Plaintiff since April 2009, when Plaintiff came to her with severe debilitating arthritis. (Id. at 342.) The osteoarthritis limits her abilities to sit or stand for longer than thirty minutes at a time. (Id.) "Complicating her arthritis, [Plaintiff] has now developed a hypercoagulable state with Protein S

deficiency." (Id.) Dr. Kluesner opined that "[b]y xrays [sic] it is likely that she has had this arthritis for 15-20+ years or longer." (Id.)

**The ALJ's Decision**

The ALJ first determined that Plaintiff met the insured status requirement of the Act through June 30, 2005. (Id. at 12.) She next found that Plaintiff had engaged in substantial gainful activity (SGA) during 1991, 1993, 1996, 2002, 2003, and 2004. (Id.) The ALJ then addressed the twelve-month continuous periods during which Plaintiff did engage in SGA. (Id. at 13.) She noted Plaintiff's testimony about being in so much pain in 2004 and 2005 that it was sometimes hard for her to walk. (Id.) She further noted that the only medical records for that period were for Depo-Estradiol injections typically given to treat the symptoms of menopause but which Plaintiff testified were to keep her calm. (Id.) Plaintiff also testified that her gynecologist told her she had arthritis and to take over-the-counter medications to relieve the resulting pain. (Id.) The ALJ noted, however, that the records did not reflect either the diagnosis or treatment. (Id.) Nor was there any treatment record for Plaintiff's allegedly disabling symptoms for the period from 1991 through 2010. (Id.) Subsequent medical evidence is irrelevant. (Id.) Thus, the ALJ concluded, there were no medical signs or laboratory findings to support the existence of a medically determinable impairment through the date last insured. (Id.)

Additionally, although offered the opportunity to submit additional medical records for 2004 and 2005, Plaintiff did not do so. (Id. at 14.) The ALJ noted that Plaintiff was working for much of the time she alleged she was disabled, e.g., she alleged a disability

beginning in 1991 but worked as a bank teller from 1992 to 1995, as a county clerk from 1995 to 1997, and as a telephone representative for mortgage companies from 2001 to 2004. (Id.) The ALJ concluded that Plaintiff was not under a disability from the alleged disability onset date of May 1, 1991, through June 30, 2015, the date she was last insured. (Id.)

## Additional Record Before the Appeals Council

After the ALJ entered his adverse decision, Plaintiff, now represented by counsel, submitted an undated letter from Dr. Wilbois, explaining that her Plaintiff's records had been accidently shredded, but that he remembered her "quite clearly." (Id. at 400.) He treated her from the mid-1970s to 2010 for her "weight, hypertension, stress, anxiety, panic attacks, arthritis, and menopause symptoms as well as sundry other routine conditions." (Id.) He also recalled that she had to "stop work because of stress and anxiety at one point." (Id.)

## Standards of Review

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 423(d)(1). Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months. **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002). Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy,

- 11 -

regardless of whether . . . a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work." 42 U.S.C. § 423(d)(2)(A).

"The Commissioner has established a five-step 'sequential evaluation process' for determining whether an individual is disabled.'" **Phillips v. Colvin**, 721 F.3d 623, 625 (8th Cir. 2013) (quoting Cuthrell v. Astrue, 702 F.3d 1114, 1116 (8th Cir. 2013) (citing 20 C.F.R. § 404.1520(a)[5]). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 404.1520(b); **Hurd v. Astrue**, 621 F.3d 734, 738 (8th Cir. 2010). Second, the claimant must have a severe impairment. See 20 C.F.R. § 404.1520(c). A "severe impairment" is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id. Third, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. § 404.1520(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Bowen v. City of New York**, 476 U.S. 467, 471 (1986); **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009). "'Before determining a claimant's RFC, the ALJ first must evaluate the claimant's

---

[5]Unless otherwise indicated, all citations to the Code of Federal Regulations are to the revision in effect at the time of the ALJ's decision.

credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)). At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove her RFC and establish she cannot return to her past relevant work. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee v. Astrue**, 638 F.3d 860, 863 (8th Cir. 2011) (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)).

**Discussion**

Plaintiff argues that the ALJ erred when finding that there is no evidence to support the conclusion that she did not have a medically determinable impairment on or before June 30, 2005. Specifically, there is evidence that she had arthritis and a blood clotting problem during the relevant period and that the absence of medical records due to the records being shredded should not negate that evidence.

The regulations provide that a claimant's allegedly disabling "impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [a claimant's] statement of symptoms . . . ." 20 C.F.R. § 404.1508. "In the absence of a showing that there is a 'medically determinable physical or mental impairment,' an individual must be found not disabled at step 2 of the sequential evaluation process." Social Security Ruling 95-4p, 1996 WL 374187, *1 (S.S.A. July 2, 1996). "No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be . . . " Id.

Plaintiff described during the 2013 hearing the intensity of her pain in 2004 and 2005. Under the regulations, this is insufficient to establish the existence of a disabling impairment during that period. She argues, however, that the existence of disabling arthritis and a blood clotting disorder have been established by the letters of Drs. Wilbois and Kleusner.

Assuming, without deciding, that Plaintiff had arthritis and a blood clotting disorder before June 30, 2005, "[t]o support the award of disability benefits, a disease must have progressed from latency to a level constituting severe impairment as defined under Title II before the expiration of the insured period." **List v. Apfel**, 169 F.3d 1148, 1149 (8th Cir. 1999). "Retrospective medical diagnoses constitute relevant evidence concerning the degree of disability prior to the expiration of the insured period." **Id.** "However, evidence outside the relevant time period cannot serve as the only support for the disability claim. Such a holding would be contrary to the Social Security Act, 42 U.S.C. §§ 416(i), 423(c)." **Pyland v. Apfel**, 149 F.3d 873, 878 (8th Cir. 1998).

"In a case involving a degenerative disease . . . , where a claimant does not have contemporaneous objective medical evidence of the onset of the disease, the ALJ must consider all of the evidence on the record as a whole, including the lay evidence and the retrospective conclusions and diagnosis of her doctor." **Grebenick v. Chater**, 121 F.3d 1193, 1199 (8th Cir. 1997). "'If the [treating doctor's retrospective] diagnosis is based upon a medically acceptable clinical diagnostic technique, then it must be considered in light of the entire record to determine whether it establishes the existence of a physical impairment prior to the expiration of the claimant's insured status.'" **Id.** (quoting Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984)) (alteration in original).

Assuming, without deciding, that Plaintiff has a degenerative form of arthritis, the evidence she cites does not support a finding that it was disabling before June 30, 2005. For instance, Dr. Wilbois wrote the Appeals Council that he treated Plaintiff from the mid-1970s

to 2010 for, among other things, hypertension, stress, anxiety, panic attacks, and arthritis. This does not reflect the severity of any of these conditions during the relevant time period. Nor does his reference to Plaintiff having to stop work "at one point" because of stress and anxiety. The record reflects that Plaintiff did not work during 1998, 1999, and 2000. She was being treated by Dr. Wilbois during that time and there is nothing in the record to suggest that it was not then when stress and anxiety might have caused her to temporarily stop work. Moreover, her hearing testimony said nothing about stopping work in 2004 due to stress and anxiety. Indeed, she reported when applying for DIB that she stopped working because she was laid off.

Dr. Kluesner wrote in 2009 that Plaintiff was under her care for, among other things, debilitating osteoarthritis in her knees and hips. Plaintiff did not begin treatment with Dr. Kluesner until April 2009, almost four years after her date last insured. And, Dr. Kluesner's treatment notes consistently refer to Plaintiff having "mild to moderate" arthritis in her right knee. Neither arthritis nor osteoarthritis are included at any time in the list of Plaintiff's chronic problems.

In March 2012, Dr. Kluesner wrote that Plaintiff had osteoarthritis in her back, hips, knees, and shoulders. Again, that arthritis was never described as more than moderate and was never listed as a chronic problem. Moreover, the diagnoses of mild to moderate acromioclavicular and minimal glenohumeral osteoarthritis begin in January 2010 – four and one-half years after the date last insured – when Plaintiff complained for the first time of shoulder pain.

In 2013, Dr. Kluesner wrote that she has been treating Plaintiff since April 2009 when Plaintiff came to her with severe debilitating arthritis. In addition to this characterization being inconsistent with Dr. Kluesner's treatment notes, it is almost four years after Plaintiff's date last insured. Nor does Dr. Kluesner's reference to it being "likely" that Plaintiff has had arthritis for at least fifteen years establish that Plaintiff indeed had arthritis before June 30, 2005, or had the necessary degree of severity before that date.

Plaintiff also cites her hypercoagulable state with Protein S deficiency, a genetic condition, as a disabling impairment prior to June 2005. This citation is unavailing given (a) her own report that it did not develop until at least 2011 and (b) Dr. Kluesner's reference in 2013 to Plaintiff having *recently* developed a hypercoagulable state with Protein S deficiency 2.

Addressing the lack of any record of a contemporaneous diagnosis of any of the impairments cited by Plaintiff as being disabling between May 2004 and June 2005, Plaintiff argues that the ALJ erred by finding there was no medically determinable impairment at that time merely because Dr. Wilbois' records had been shredded. This argument is unavailing for two reasons. First, there were records before the ALJ from Dr. Wilbois that covered the relevant period, including records referencing Plaintiff's high blood pressure and weight. Second, as noted above, it is Plaintiff's burden to prove that she had a medically determinable impairment in 2004 and 2005, not the ALJ's obligation to disprove her allegations of such.

"Ultimately, the claimant bears the burden of proving disability and providing medical evidence as to the *existence* and severity of an impairment." **Kamann v. Colvin**, 721 F.3d

945, 950 (8th Cir. 2013) (emphasis added). This Plaintiff has failed to do for the period on or before June 30, 2005.

### Conclusion

An ALJ's decision is not to be disturbed "'so long as the . . . decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because [the Court] might have reached a different conclusions had [the Court] been the initial finder of fact.'" **Buckner v. Astrue**, 646 F.3d 549, 556 (8th Cir. 2011) (quoting Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008)). Although Plaintiff articulates why a different conclusion might have been reached, the ALJ's decision, and, therefore, the Commissioner's, was within the zone of choice and should not be reversed for the reasons set forth above.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Order of Dismissal shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  27th  day of January, 2015.